IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

CYRUS KAR
2542 N. Beachwood Drive, No. 8
Los Angeles, CA 90068

                Plaintiff,

      v.

DONALD RUMSFELD,
2206 Kalorama Road
Washington, DC  20008

ROBERT GATES, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF DEFENSE
The Pentagon
1600 Defense Pentagon
Washington, DC 20301

GEORGE W. CASEY, JR.,
200 Army Pentagon
Washington, DC  20310

WILLIAM H. BRANDENBURG,
8 Palm Circle Drive
Honolulu, HI 96819

JOHN AND JANE DOES 1 THROUGH 10,

                Defendants.

No. _____

---

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

**INTRODUCTION**

1.      The most elemental legal principles by which we govern ourselves cannot countenance lawless detention of a United States citizen by his own government.  Our Constitution, consistent with bedrock rules of international law, has always mandated that our government not arrest its citizens and hold them for lengthy periods of indefinite duration,

virtually incommunicado, without bringing charges, affording access to counsel, and providing adequate legal process.

2.    No less fundamental to our rule of law is the principle that the government must give effect to an adjudication of innocence.  Were it otherwise, our system would become one wherein an individual is not presumed innocent until proven guilty, but rather treated as guilty even after proven innocent.

3.    This action is brought to obtain compensatory and punitive damages for the violation of these bedrock principles to which Cyrus Kar, a United States citizen and U.S. Navy veteran, was subjected, resulting in his detention for nearly two months in an Iraqi prison operated by the U.S. military, and to declare that the treatment to which he was subjected violated the Constitution, international law, and the Geneva Conventions.

4.    Mr. Kar suffered abuses – including prolonged arbitrary detention without charge, the systematic denial of access to counsel, and the absence of any court in which to challenge the legality of his detention – that directly resulted from the policies and practices of the U.S. military in its detention operations in Iraq.

5.    In May 2005, United States military personnel arrested Cyrus Kar at a vehicle checkpoint near Baghdad, Iraq, and detained him for almost two months in a jail near the Baghdad airport.  The reason for the arrest was the discovery of washing machine timers, which apparently can be used to make bombs, in the trunk of a taxi in which Mr. Kar was riding.  Within days of his arrest, the government knew that he had no knowledge of those timers, and soon thereafter, the FBI had completed its investigation of him and, after a thorough search of his home, cleared him of all suspicion.  Mr. Kar even submitted to and passed a lie detector test while in custody.

6.    Despite his innocence, U.S. military officials continued to willfully subject Mr. Kar to virtually incommunicado detention.  Only after ACLU attorneys had contacted government authorities on his behalf did the U.S. military finally hold a military hearing to consider Mr. Kar's status under the Geneva Conventions.  Most shockingly, the government

continued to detain Mr. Kar for another week even after he was exonerated at that hearing, ultimately releasing him one day before it was to respond in court to a habeas lawsuit brought by family members to challenge his detention.

7.       During his ordeal, Mr. Kar suffered physical and psychological abuses. While transporting him to a detention center, the U.S. military hooded Mr. Kar, preventing him from breathing freely, and restrained his hands in painful flexi-cuffs. Soldiers threatened, taunted and insulted him, and exposed him for hours in the sun to extremely high temperatures. At one point, a soldier at the notorious Abu Ghraib prison slammed his head into a concrete wall.

8.       Government investigators aggressively interrogated Mr. Kar, threatening that if he stayed silent, he would be indefinitely detained. Although Mr. Kar cooperated in every way with the government's investigation, the military refused to allow him to speak with an attorney or a U.S. embassy official. The military granted him only three brief, monitored phone calls to his family, and deliberately failed to notify him that the FBI had cleared him of all suspicion. For almost two months, Mr. Kar sat alone for 23 hours each day in a cramped jail cell, not knowing why he was there or whether he would ever be released.

9.       In late June 2005, unbeknownst to Mr. Kar, his family in the U.S. contacted lawyers who demanded information from the military as to his status. A week later, the U.S. military suddenly granted Mr. Kar a military hearing to determine his status under the Geneva Conventions. Despite lacking access to an attorney and even the documents of his own case, Mr. Kar persuaded the military tribunal that he was an innocent civilian. The military panel recommended his immediate release, but the military took no steps to release him. Only after his family members filed a habeas petition in federal district court and a federal judge ordered the government to show why Mr. Kar should continue to be held did the U.S. military finally release him, on July 10, 2005. But for the habeas case and the accompanying media attention to his case, Mr. Kar would have remained indefinitely in solitary confinement.

10.     Mr. Kar's experience in the dark abyss of U.S. military detention in Iraq was not unusual.  To the contrary, it was pursuant to our government's policy and practice.  This case is brought to obtain compensation for Mr. Kar and to declare those practices unlawful.

## JURISDICTION AND VENUE

11.     This is a complaint for declaratory relief and compensatory damages based upon civil rights violations committed by the United States military and its uniformed officers, employees and/or agents, in violation of the Fourth and Fifth Amendments to the U.S. Constitution.  This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 (federal question), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Plaintiff's claims based on the law of nations and based on the Geneva Conventions arise under the U.S. Constitution, treaties, and the laws of the United States.

12.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2); 1391(b)(3); 1391(e)(1); and § 1391(e)(2).  Defendant Gates can be found in this district, and Defendant Rumsfeld resides in this district.

## PARTIES

13.     Plaintiff Cyrus Kar is a United States citizen who resides in Los Angeles, California.  From approximately May 17, 2005 to July 10, 2005, Mr. Kar was detained in the custody of Defendants at Camp Cropper, a United States military detention facility near Baghdad, Iraq.  At all relevant times, he was detained under the jurisdiction and control of the United States military.  He was eventually released from detention without ever being charged of a crime or any wrongdoing.

14.     Defendant Donald Rumsfeld at all relevant times was the Secretary of Defense of the United States.  At all relevant times, the United States military under the command of Defendant Rumsfeld exercised control and authority over detention of persons, including U.S. citizens, in Iraq.  Defendant Rumsfeld initiated and issued orders and policies, and granted authorizations that foreseeably led to the prolonged arbitrary detention and the cruel, inhuman or degrading treatment of Plaintiff and the violations of his due process rights.  He is no longer

the Secretary of Defense, and is no longer engaged in any war. He is sued in his individual capacity.

15.    Defendant Robert Gates is the current Secretary of Defense of the United States. As such, it is under his command that the United States military currently exercises control and authority over detention of persons, including U.S. citizens, in Iraq. Defendant Gates has not discontinued the orders and policies initiated and issued by Defendant Rumsfeld that led to the violations of Plaintiff's rights. He is sued in his official capacity and the only relief sought against him is declaratory relief.

16.    Defendant General George W. Casey, Jr. at all relevant times was the Commanding General of the Multi-National Force-Iraq ("MNF-I"), the U.S. military forces deployed in Iraq. As a consequence of Defendant Rumsfeld's actions and on his own initiative, General Casey initiated and issued policies and authorizations that expressly permitted and led to the prolonged arbitrary detention and the cruel, inhuman or degrading treatment of Plaintiff and the violations of his due process rights. He is no longer commanding armed forces in Iraq or engaged in any war. He is sued in his individual capacity.

17.    Defendant Major General William H. Brandenburg was the Commanding General of Task Force 134 (Detainee Operations) for the Multi-National Force-Iraq, at all relevant times, including the time of Plaintiff's detention. As a consequence of Defendant Rumsfeld and Defendant Casey's actions and on his own initiative, Defendant Brandenburg personally executed unlawful policies, patterns or practices causing the prolonged arbitrary detention and the cruel, inhuman or degrading treatment of Plaintiff and the violations of his due process rights. Defendant Brandenburg was responsible for oversight of all U.S. military detention operations in Iraq. He is sued in his individual capacity.

18.    Plaintiff does not know the true names and capacities of Defendants sued herein as Does 1 through 10, and therefore sues these Defendants by such fictitious names. Does 1-10 are current or former employees of the United States military who directed or

participated in the detention of Plaintiff at Camp Cropper, including persons who transported Plaintiff into detention and held Plaintiff in detention. As a consequence of Defendant Rumsfeld and Defendant Casey's actions and on their own initiative, Defendants Does 1-10 personally executed unlawful policies, patterns or practices causing the prolonged arbitrary detention and the cruel, inhuman or degrading treatment of Plaintiff and the violations of his due process rights. Plaintiff will amend this complaint to allege the true names and capacities of Does 1-10 when that information is ascertained. Each Doe Defendant is responsible in some manner for the unlawful acts and omissions herein alleged, and Plaintiff's injuries were proximately caused by the conduct of such Defendants. They are sued in their individual capacities.

## LEGAL FRAMEWORK

19.     Plaintiff's constitutional claims arise under the Fourth and Fifth Amendments to the United States Constitution, which prohibit any person acting under color of United States law from unreasonably seizing and detaining a person, and from depriving any person of liberty without due process of law. Defendants' violations of Plaintiff's Fourth Amendment and due process rights give rise to causes of action for damages pursuant to Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

20.     The acts described herein constitute prolonged arbitrary detention and other cruel, inhuman or degrading treatment, and are within the body of acts that violate such definite and accepted international norms, as codified in numerous conventions and international instruments, including the Geneva Convention relative to the Treatment of Prisoners of War, 75 U.N.T.S. 135, entered into force Oct. 21, 1950; Geneva Convention relative to the Protection of Civilian Persons in Time of War, 75 U.N.T.S. 287, entered into force Oct. 21, 1950; and the International Covenant on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force Mar. 23, 1976.

**STATEMENT OF FACTS**

21.    Cyrus Kar is a United States citizen and a veteran of the United States Navy. He was honorably discharged from the Navy.

22.    Mr. Kar is an innocent civilian who has never been engaged in hostilities against the United States, or taken up arms against the United States.  He does not pose, and has never posed, any threat or danger to the United States.

23.    For the past few years, Mr. Kar has worked as a documentary film-maker. Since 2002, he has been working on a documentary film on the historical figure of Cyrus the Great, a Persian emperor believed to be the first ruler in all of history to legislate and promote human rights.

24.    In order to film his documentary, Mr. Kar visited several historical sites in Tajikistan, Afghanistan, Iran, and Turkey in 2004.  In May 2005, after obtaining visas and permission from the Iraqi, American, and Kurdish authorities, Mr. Kar went to Iraq with a cameraman in order to briefly film footage of Babylon, an area in present-day Iraq that was the site of one of Cyrus the Great's most important military victories.

Mr. Kar's Arrest And Transport To Detention Facilities

25.    On or about May 17, 2005, Mr. Kar and Farshid Faraji, an award-winning cameraman from Iran, hired a taxi at a central taxi depot in Baghdad and rode to a historical site for filming.  On the way, the taxi stopped at a routine vehicle checkpoint operated by the Iraqi police near the city of Balad.  When Iraqi police searched the taxi, they found a number of washing machine timers in the trunk of the car.  Such washing machine timers allegedly have been used to make improvised explosive devices in Iraq.  Upon finding the timers, Iraqi police immediately arrested Mr. Kar, Mr. Faraji, and the taxi driver.

26.    The Iraqi police transported Mr. Kar and Mr. Faraji to a nearby Iraqi police station.  Mr. Kar at once informed the Iraqi police that he was an American citizen and showed his U.S. passport.  The Iraqi police then transferred him and Mr. Faraji to U.S. military custody.

27.    The U.S. military blindfolded Mr. Kar and Mr. Faraji and transported them to four different detention centers in two days.  First, the two men were at Poliwada detention center, which was adjacent to the police station.  There, soldiers left Mr. Kar and Mr. Faraji handcuffed, blindfolded, and sitting in a fetal position in an outdoor cage for approximately eight hours, without any food.

28.    After several hours, a U.S. Army officer brought in Mr. Kar for interrogation.  Before the interrogation began, a soldier threatened Mr. Kar that he was in big trouble, that his case would be known to the President, and that he was the next John Walker Lindh.  Mr. Kar was baffled by this.  After they explained about the washing machine timers, Mr. Kar truthfully told the interrogator that he and his cameraman did not know the taxi driver and had never seen him before hiring the taxi, that the timers were not his, and that he and Mr. Faraji had not seen or known of the contents of the trunk.  Mr. Kar asked the interrogator to verify these facts with the taxi driver.

29.    Some time later, the Army interrogator told Mr. Kar that upon questioning, the taxi driver had admitted that the timers were his and his alone, and that his passengers had not known about them.

30.    The following day, soldiers left Mr. Kar and Mr. Faraji in an outdoor cage, subjecting them to oppressive heat of over 120 degrees Fahrenheit for several hours.  They interrupted them only once to take a photo.  The soldiers placed Mr. Kar, Mr. Faraji, and the taxi driver next to each other, kneeling on the ground.  In front of them, the military displayed Mr. Kar's camera equipment and the washing machine timers and snapped photographs of them.  The Army interrogator made a callous joke that the Army used to stack up prisoners naked in a pyramid, but they were not allowed to do that anymore.  Though Mr. Kar objected to appearing in photos with the timers as falsely suggesting his guilt, he had no choice but to appear in these misleading photos, since he was in handcuffs and under the control of the military officers.  As an American citizen, he was shocked to be treated this way, especially after the Army interrogator confirmed his innocence.

8

31.     The following afternoon, the U.S. military took Mr. Kar, Mr. Faraji, and another suspect on a three-hour humvee ride from the Poliwada facility to another detention facility in Tikrit. There were three humvees, each carrying one suspect. Soldiers restrained Mr. Kar's hands in overly tight flexi-cuffs, which are known to cause skin lesions and nerve damage. They hooded him with a blindfold that covered his nose, eyes, and forehead. The blindfold was lined with thick cotton to prevent him from seeing out. The temperature inside the humvee was unbearably hot. The windows were closed, and the only air that came in was through the machine gun turret when the vehicle was moving. Mr. Kar had trouble breathing because of the heat and the blindfold. At times, the humvee was stationery because of engine problems and other delays. When the humvee stopped, the soldiers would exit the vehicle to get fresh air, but Mr. Kar was forced to remain in the sweltering heat of the vehicle. At one point, one of the humvees broke down, and the vehicles were stationery for perhaps twenty minutes or more. Soldiers were outside repairing the vehicle, and inside Mr. Kar was drenched with sweat. He passed in and out of consciousness from heat exhaustion. He felt that the soldiers did not care if he was dead or alive. He was terrified and kept telling himself to stay awake.

32.     From the facility in Tikrit, the military transported them by helicopter to the Abu Ghraib prison, where they endured harsh and degrading treatment. At Abu Ghraib, a U.S. soldier ordered Mr. Kar and Mr. Faraji to put their heads up against a concrete wall. Mr. Kar followed the order, with his head inches away from the wall. The soldier grabbed his head and slammed it into the wall, claiming that Mr. Kar had not followed his order. The soldier then yelled at Mr. Faraji to strip. Mr. Faraji did not react because he did not understand English. The soldier yelled at Mr. Faraji again, and Mr. Kar explained that he did not understand, and translated the order. The soldier treated both men with disdain, cursing at them. Mr. Faraji later told Mr. Kar that he had been made to strip in the presence of female military personnel, who laughed at him after he disrobed. Mr. Kar felt degraded by this treatment by the U.S. soldiers at Abu Ghraib.

Solitary Confinement At Camp Cropper

33.    Finally, the military transported Mr. Kar from Abu Ghraib to Camp Cropper, where he remained for close to two months. Camp Cropper is a U.S. military detention facility near the Baghdad airport that houses persons considered to be high-value detainees.

34.    The military placed Mr. Kar in solitary confinement at Camp Cropper, in a one-person cell that measured approximately eight feet by eight feet.  The door to the cell had a small opening through which guards passed meals to Mr. Kar.  It also had a small window of ten by five inches, which was covered with dark paper to prevent him from seeing outside. The cell had no toilet or sink, only a Gatorade bottle for emergencies.  Military guards escorted Mr. Kar to an outdoor restroom as necessary.

35.    Mr. Kar spent 23 hours a day inside his cell, without any human contact.  For approximately one hour each day, the military allowed Mr. Kar to go for recreation into a 15' x 15' chain-link cage that was placed outdoors and covered with a tarp on all sides, in which one other detainee was present.

36.    Approximately four days after Mr. Kar came to Camp Cropper, an FBI agent interrogated him.  Prior to the interrogation, the agent showed Mr. Kar a document stating that he had the right to an attorney.  Mr. Kar asked if there were attorneys in Baghdad.  The FBI agent laughed and said that attorneys were not available.  He also told Mr. Kar that he had the right to remain silent, but that the last person who had remained silent was still in detention after two years, in Afghanistan.  Intimidated and believing he had no choice, Mr. Kar answered the FBI agent's questions without an attorney present.

37.    During the interrogation, the FBI agent asked Mr. Kar for whom he had voted in the 2004 presidential election, and why.  Mr. Kar stated that he voted for John Kerry because, although he supported the invasion of Iraq, he opposed the domestic policies of the Bush administration.  The agent also asked Mr. Kar to agree to a search of his home and property in Los Angeles and to take a lie detector test.  Mr. Kar agreed, repeating to the FBI

agent that because he had no connection whatsoever to the taxi driver or the washing machine timers, he had nothing to hide.

38.    On or about May 23, 2005, FBI agents conducted an exhaustive search of Mr. Kar's apartment in Los Angeles.  They seized his belongings, including his computer, hard drives, film footage, and files containing personal and financial records.  The agents also surveyed the residence, which included prominent photographs of Mr. Kar serving in the Navy and a huge American flag hung over his bed.

39.    About two weeks later, FBI agents returned Mr. Kar's belongings to his family members.  At that time, an FBI agent told Mr. Kar's family that the FBI had cleared him of all suspicion, and that the agent looked forward to meeting Mr. Kar upon his return to Los Angeles.

40.    On or about June 15, 2005, the FBI administered a lie detector test to Mr. Kar while he was in custody.  Before taking the test, Mr. Kar again asked for an attorney, and the FBI once more told him that they could not provide one.  Mr. Kar took the lie detector test, anticipating that it would clear him.  He answered the questions truthfully, and the person who administered the test privately told Mr. Kar that he had passed.

41.    After the lie detector test, neither the FBI, nor the military, nor any other government agency conducted any further investigation of Mr. Kar.

In The Black Hole Of U.S. Military Detention

42.    The U.S. military deliberately gave Mr. Kar no information about his case. Neither did it file any charges against him.  Rather, it kept him in detention and in the dark, paying no respect to his rights as a U.S. citizen, much less his prior service to the U.S. Navy. Without any information or prospect for release, Mr. Kar's health rapidly declined.  He lost fifteen pounds while in custody, and a jail doctor examining him told him that his blood pressure had skyrocketed.

43.    Mr. Kar grew increasingly desperate for information and wondered whether he would ever be released.  He repeatedly asked to speak to an attorney and to someone from the

U.S. embassy, and for a copy of his file. These requests, which he made orally and in writing, went unanswered or denied. He also asked Lieutenant Colonel Haas, the Commandant of the Camp Cropper facility, about what was happening in his case, and she responded that she could not answer his questions. To his written request to send a letter to his Senator, Lieutenant Colonel Haas replied that only correspondence to family regarding family issues could be mailed from the facility.

44.    During his detention, the military all but deprived Mr. Kar of telephone contact with his family and loved ones. During the first week of detention at Camp Cropper, he was not allowed any phone access at all. His relatives assumed he was dead.

45.    On the eighth day of his detention, representatives from the International Committee of the Red Cross ("ICRC") visited him. That same day, the FBI allowed Mr. Kar to make a short ten-minute phone call to his aunt in Los Angeles. He had not been allowed any phone calls until the ICRC's visit.

46.    The U.S. military allowed Mr. Kar to call his family on only two more occasions, each time for no more than ten minutes. At the end of the first call, soldiers told Mr. Kar that he could call home no more than once a month. During these calls, the soldier monitoring the call told him not to answers certain questions from his aunt, and told him when to hang up.

47.    On June 17, 2005, Mr. Kar's family in Los Angeles contacted the American Civil Liberties Union ("ACLU"). ACLU attorneys spoke with Mr. Kar's family on June 20, 2005. Over the course of the next week, those attorneys contacted numerous government agencies, including the FBI, the State Department, the Defense Department, and Multi-National Force-Iraq ("MNF-I") (the U.S. military forces deployed in Iraq), to inquire about Mr. Kar's status and request his release. The government did not respond to these inquiries, and one FBI official would state only that Mr. Kar was either in American military or Iraqi custody in Iraq.

Continued Detention After Being Found An Innocent Civilian

48.    On July 1, 2005, Lieutenant Colonel Haas came to Mr. Kar's cell and gave him
a letter informing him that the military had scheduled a hearing on July 4, 2005 to determine
Mr. Kar's status under the Geneva Conventions.  The letter, written by Lieutenant Colonel
John Dunlap, who was President of the Detainee Status Board at the time, stated that the
military suspected Mr. Kar of being in possession of explosive materials at the time of his
arrest, and that it would hold a military hearing on July 4, 2005 to determine his status under
the Geneva Conventions.  The letter stated that Mr. Kar could have a "personal representative"
at the hearing if one was immediately available, but that he did not have the right to legal
counsel.  The letter also stated that the judges at the hearing could review evidence in secret
outside of Mr. Kar's presence.

49.    On the morning of July 4, 2005, guards took Mr. Kar to another room in the
prison where his hearing was held.  At the hearing, three military attorneys acted as judges.  A
court reporter transcribed the hearing, and an enlisted officer acted as bailiff.

50.    The hearing so lacked in procedures that it seemed a cruel farce to Mr. Kar.
For example, the bailiff said he had to swear in the three military judges, but the judges said
they had to swear in the bailiff.  After some discussion, they agreed that the judges would
swear in the bailiff, who then swore in the judges who had sworn him in.

51.    To present his defense, Mr. Kar asked for an attorney.  He also asked for the
FBI and military officials who had interrogated and exonerated him to appear at the hearing.
He asked to see the reports those officials had produced.  He also asked for the results of his
lie detector test, his medical records while in custody, and for his cameraman Mr. Faraji to
serve as a witness.

52.    The judges denied Mr. Kar's request for an attorney and his request for
documents, stating that the documents he requested were confidential and could not be shared,
except for the lie detector test results, which they read aloud.  (The lie detector results

confirmed his innocence.)  They also told Mr. Kar that all the witnesses he requested were unavailable except for Mr. Kar's cameraman.

53.    Mr. Kar was appalled and frustrated at being denied his rights as a U.S. citizen to a fair hearing.  Nevertheless, he testified that he had no connection to the taxi driver or the washing machine timers.  His cameraman also testified to the same.  The judges then sent Mr. Kar out of the room for a few minutes.  When they called him back in, the judges informed him that they had found him innocent and were recommending his immediate release.

54.    Despite the outcome of the hearing, the military did not release Mr. Kar.  On July 6, 2005, Lieutenant Colonel Haas gave Mr. Kar another letter.  This letter, also written by Lieutenant Colonel John Dunlap, noted that a military hearing had been held to determine his status under the Geneva Conventions.  It stated that the previous letter had "inadvertently omitted the criteria" upon which the judges' decision had been made and then explained the criteria.  The letter stated that the judges had found him to be an "Innocent Civilian" under the Geneva Convention, entitling him to immediate release.

55.    Despite this finding of innocence, Mr. Kar remained in detention.  He repeatedly asked guards why he was still in detention, but no one provided an answer.  He grew increasingly despondent, as he had no idea that his family had filed a habeas petition on his behalf in the United States.

56.    Finally, on July 10, 2005, one day before the government was required to appear in this Court to answer the habeas petition filed on Mr. Kar's behalf, the government released Cyrus Kar.  When he was released, Mr. Kar discovered that his civilian clothes had been thrown away and his class ring was missing.

57.    Upon his release, Mr. Kar's attorneys negotiated with government officials to issue him a travel document to return home, as the military had destroyed his U.S. passport during its investigation of him.  Mr. Kar made his way back to the United States by July 17, 2005.

58.    Mr. Kar was and remains traumatized by his indefinite and virtually incommunicado detention, in solitary confinement, by the U.S. military without charge.  He suffered pain and suffering, mental anguish, and loss of income and livelihood.

U.S. Military Policies Regarding Detention In Iraq

59.    Plaintiff is informed and believes that the United States military, together with other U.S. government agencies, has a policy, pattern, and practice of deliberately failing to provide access to attorneys to persons held in detention in Iraq, including U.S. citizens held in U.S. custody, for purposes of custodial interrogation, representation at military hearings, and during lengthy and indefinite time periods of detention.

60.    Plaintiff is informed and believes that the United States military, together with other U.S. government agencies, has a policy, pattern, and practice of deliberately subjecting persons, including U.S. citizens held in U.S. custody, to lengthy and indefinite time periods of detention in Iraq, without bringing charges of any other kind.  Such detention is premised upon evidence that does not even approach the quantum necessary for probable cause or even reasonable suspicion.

61.    Plaintiff is informed and believes that the United States military, together with other U.S. government agencies, has a policy, pattern, and practice of deliberately failing to provide persons detained in Iraq, including U.S. citizens held in U.S. custody, with access to a court or effective legal process to challenge the legality of their detention.

62.    Plaintiff is informed and believes that the United States military, together with other U.S. government agencies, has a policy, pattern, and practice of deliberately failing to provide access to family members or loved ones to persons held in detention in Iraq, including U.S. citizens held in U.S. custody, and failing to notify close family members of the arrest and detention.

63.    Plaintiff is informed and believes that the United States military, together with other U.S. government agencies, has a policy, pattern, and practice of detaining persons, including U.S. citizens held in U.S. custody, for a prolonged and indefinite duration before

holding hearings to determine their status under the Geneva Conventions.  The procedures of such hearings do not conform to Constitutional due process requirements, and they do not satisfy the applicable provisions of the Geneva Conventions, and the results of such hearings are not timely enforced.

64.    Plaintiff is informed and believes that the United States military, together with other U.S. government agencies, has a policy, pattern, and practice of failing to satisfy the applicable provisions of the Geneva Conventions governing the treatment of prisoners of war and civilian persons.

65.    The afore-described policies, patterns and practices of treatment of detainees in Iraq are deliberately coercive in nature, and administered to strip detainees of their dignity and will.  Defendants' policies, patterns and practices continue to remain in effect and govern the treatment of detainees in Iraq, including U.S. citizens held in U.S. custody.  Defendants have acknowledged the existence and use of these policies, patterns, and practices.

66.    Each of the Defendants knew or had reason to know that his or her actions and failures of duty would foreseeably lead the U.S. military to violate the due process rights of Plaintiff, violate the law of nations prohibiting prolonged arbitrary detention and the cruel, inhuman or degrading treatment of Plaintiff, and violate the Geneva Conventions.  Each of the Defendants acted under color of law, but beyond the scope of his or her lawful and delegated authority, and in so doing, each of the Defendants violated clearly established constitutional rights and other domestic and international laws, and knew that he or she was doing so.

67.    Mr. Kar's experience in detention resulted directly from the detention policies of the U.S. military.  Several human rights organizations have noted that the common features of the U.S. military detention system in Iraq include virtually incommunicado detention, lack of judicial review and oversight of detention, lack of time limits on pre-trial detention, and lack of access to counsel.  *See e.g.* United Nations Assistance Mission for Iraq, *Human Rights Reports* (July 2005 through March 2007), available online and indexed at http://www.uniraq.org/aboutus/HR.asp (last visited May 7, 2007); Amnesty International,

*Beyond Abu Ghraib: Detention And Torture In Iraq* (March 2006), available online at
http://web.amnesty.org/library/pdf/MDE140012006ENGLISH/$File/MDE1400106.pdf (last
visited May 7, 2007); Global Policy Forum, *War And Occupation In Iraq: Chapter 4 -
Detention And Prisons* (January 2007), available online at
http://www.globalpolicy.org/security/issues/iraq/occupation/report/detention.htm (last visited
May 7, 2007).  These sources also note that detention often is initiated by mass warrantless
arrests and does not end despite administrative release orders.  *Id.*  The vast majority of
detainees in U.S. military custody in Iraq have never been charged or tried of any crime or had
the opportunity to challenge their detention before a judicial body.

**FIRST CAUSE OF ACTION**

**<u>VIOLATION OF DUE PROCESS</u>**

68.    Plaintiff realleges and reincorporates the foregoing paragraphs as if set forth
herein.

69.    Defendants' actions described herein violated the rights of Plaintiff, who is a
U.S. citizen, under the Due Process Clause of the Fifth Amendment to the United States
Constitution by depriving him of liberty without due process of law.

70.    Defendants' actions and omissions violated Plaintiff's due process rights by: (a)
failing to provide Plaintiff access to an attorney for purposes of custodial interrogation,
representation at military hearings, and during his lengthy and indefinite detention; (b)
subjecting him to prolonged, arbitrary, and indefinite detention without bringing criminal
charges or charges of any other kind, without sufficient evidence, and after the government's
investigation cleared him of all suspicion; (c) failing to provide him access to a court or
effective legal process to challenge the legality of his detention; (d) failing to provide him
access to family members or loved ones; and (e) failing to immediately release him after a
military hearing found him to be an "Innocent Civilian" and ordered his release.

71.    Defendants' actions, orders, authorizations, approvals and omissions, which
deprived Plaintiff of his due process rights, give rise to a cause of action for damages directly

under the Fifth Amendment, pursuant to <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).

72.     Defendant Rumsfeld is liable for the violation of Plaintiff's due process rights because he had actual or constructive knowledge that his subordinates were violating the constitutional rights of Plaintiff, and had actual or constructive knowledge that it was highly likely that these constitutional violations would occur as a result of his actions, orders, policies, and authorizations.  Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to his subordinates' unconstitutional actions.  Through his actions and failures to act, Defendant Rumsfeld expressly and tacitly authorized his subordinates' unlawful conduct.

73.     Defendants Casey, Brandenburg, and Does 1-10 are liable for violating Plaintiff's due process rights because they directed and/or participated in depriving Plaintiff of his liberty in the absence of legal process.

74.     Each of the Defendants had actual or constructive knowledge that his or her detention of Plaintiff violated his due process rights, and each had actual or constructive knowledge that their actions, orders, policies, and practices would lead to such violations.

75.     Defendants acted under color of official authority in violating Plaintiff's due process rights.

76.     Defendants' actions were a proximate cause of the violation of Plaintiff's due process rights.  Plaintiff was a foreseeable victim of these acts.

77.     Defendants' violations of Plaintiff's due process rights caused Plaintiff to suffer damages, including mental and emotional pain and suffering, in an amount to be determined at trial.

78.     Defendants' violations of Plaintiff's due process rights were deliberate, willful, intentional, wanton, malicious, and oppressive.

## SECOND CAUSE OF ACTION

## UNREASONABLE SEARCH AND SEIZURE

79.    Plaintiff realleges and reincorporates the foregoing paragraphs as if set forth herein.

80.    Defendants' actions described herein violated the rights of Plaintiff, who is a U.S. citizen, under the Fourth Amendment to the United States Constitution by subjecting him to unreasonable search and seizure.

81.    Defendants violated Plaintiff's Fourth Amendment rights by: (a) seizing him and subjecting him to prolonged, arbitrary, and indefinite detention unreasonably, without probable cause, without bringing criminal charges or charges of any other kind, without sufficient evidence, and after the government's investigation cleared him of all suspicion; (b) failing to provide him access to a court or prompt, effective legal process to review his detention; (c) conducting unreasonable searches of his person; and (d) unreasonably failing to promptly release him after a military hearing found him to be an "Innocent Civilian" and ordered his release.

82.    Defendants' actions, orders, authorizations, approvals and omissions, which deprived Plaintiff of his due process rights, give rise to a cause of action for damages directly under the Fourth Amendment, pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

83.    Defendant Rumsfeld is liable for the violation of Plaintiff's Fourth Amendment rights because he had actual or constructive knowledge that his subordinates were violating the constitutional rights of Plaintiff, and had actual or constructive knowledge that it was highly likely that these constitutional violations would occur as a result of his actions, orders, policies, and authorizations.  Despite this knowledge, Defendant Rumsfeld acted with reckless and deliberate indifference to his subordinates' unconstitutional actions.  Through his actions and failures to act, Defendant Rumsfeld expressly and tacitly authorized his subordinates' unlawful conduct.

84.    Defendants Casey, Brandenburg, and Does 1-10 are liable for violating Plaintiff's due process rights because they directed and/or participated in depriving Plaintiff of his Fourth Amendment rights.

85.    Each of the Defendants had actual or constructive knowledge that his or her detention of Plaintiff violated his Fourth Amendment rights, and each had actual or constructive knowledge that their actions, orders, policies, and practices would lead to such violations.

86.    Defendants acted under color of official authority in violating Plaintiff's Fourth Amendment rights.

87.    Defendants' actions were a proximate cause of the violation of Plaintiff's Fourth Amendment rights.  Plaintiff was a foreseeable victim of these acts.

88.    Defendants' violations of Plaintiff's Fourth Amendment rights caused Plaintiff to suffer damages, including mental and emotional pain and suffering, in an amount to be determined at trial.

89.    Defendants' violations of Plaintiff's Fourth Amendment rights were deliberate, willful, intentional, wanton, malicious, and oppressive.

## THIRD CAUSE OF ACTION

## <u>VIOLATIONS OF THE LAW OF NATIONS</u>

90.    Plaintiff realleges and reincorporates the foregoing paragraphs as if set forth herein.

91.    By their actions described herein, Defendants have violated the law of nations by subjecting Plaintiff, a U.S. citizen, to prolonged arbitrary detention.  <u>See</u> <u>e.g.</u> Rest. 3d Foreign Relations § 702; International Covenant on Civil and Political Rights, 999 U.N.T.S 171, ratified by the United States on June 8, 1992 (prohibiting prolonged arbitrary detention); Jean-Marie Henkaerts & Louise Doswald-Beck, eds., Int'l Committee for the Red Cross, <u>Customary International Humanitarian Law</u>, Volume I: Rules, 344-52 (2005) (customary international law of armed conflict prohibits the arbitrary deprivation of liberty in both

international and non-international armed conflicts); U.S. Judge Advocate General,
Operational Law Handbook 59 (2003) ("No one shall be subject to arbitrary arrest or
detention.").

92.    By their actions described herein, Defendants subjected Plaintiff to cruel,
inhuman or degrading treatment in violation of the law of nations. Cruel treatment is
prohibited by Article 3 common to all four Geneva Conventions.  Geneva Convention for the
Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field of
August 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of
the Condition of the Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug.
12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to the Treatment of
Prisoners of War of August 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; and Geneva
Convention relative to the Protection of Civilian Persons in Time of War of August 12, 1949,
6 U.S.T. 3516, 75 U.N.T.S. 287 ("Common Article 3").  The prohibition on cruel treatment in
Common Article 3 forbids arbitrary deprivation of liberty during armed conflicts.  See Jean-
Marie Henkaerts & Louise Doswald-Beck, eds., Int'l Committee for the Red Cross, Customary
International Humanitarian Law, Volume I: Rules, 344 (2005) ("Common Article 3 of the
Geneva Conventions. . . require[s] that all civilians and persons hors de combat be treated
humanely. . ., arbitrary deprivation of liberty is not compatible with this requirement."). The
United States ratified the Geneva Conventions on August 2, 1955.  Common Article 3 of the
Geneva Conventions is implemented by Chapter 1-6 of Army Regulation 190-8, Enemy
Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, effective from
November 1, 1997.

93.    As an intended result of subjecting Plaintiff to prolonged arbitrary detention
and other cruel, inhuman or degrading treatment in violation of the law of nations, Plaintiff
suffered psychological pain and suffering and was in fear of his life and physical safety.

94.    Defendant Rumsfeld is liable for subjecting Plaintiff to prolonged arbitrary
detention and other cruel, inhuman or degrading treatment in violation of the law of nations

because he ordered, directed, condoned, or ratified the actions of his subordinates in subjecting Plaintiff to such treatment and because he participated in the promulgation of policies regarding U.S. military detention of persons in Iraq.

95.    Defendants Casey and Brandenburg are liable for subjecting Plaintiff to prolonged arbitrary detention and other cruel, inhuman or degrading treatment in violation of the law of nations because they caused Plaintiff to be subjected to such treatment.  Does 1-10 are liable for subjecting Plaintiff to prolonged arbitrary detention and other cruel, inhuman or degrading treatment in violation of the law of nations because they directly participated in such treatment of Plaintiff.

96.    Defendants acted under color of official authority in subjecting Plaintiff to prolonged arbitrary detention and other cruel, inhuman or degrading treatment in violation of the law of nations.

97.    Defendants' actions were a proximate cause of the prolonged arbitrary detention and other cruel, inhuman or degrading treatment suffered by Plaintiff.  Plaintiff was a foreseeable victim of these acts.

98.    Defendants' actions subjecting Plaintiff to prolonged arbitrary detention and other cruel, inhuman or degrading treatment caused Plaintiff to suffer damages, including mental and emotional pain and suffering, in an amount to be determined at trial.

99.    Defendants' actions subjecting Plaintiff to prolonged arbitrary detention and other cruel, inhuman or degrading treatment were deliberate, willful, intentional, wanton, malicious, and oppressive.

**FOURTH CAUSE OF ACTION**

**<u>VIOLATION OF THE GENEVA CONVENTIONS</u>**

100.    Plaintiff realleges and reincorporates the foregoing paragraphs as if set forth herein.

101.    Plaintiff, a U.S. citizen, was subject to prolonged arbitrary detention and other cruel, inhuman or degrading treatment during his detention in U.S. military custody in Iraq, in

violation of provisions of the Third and Fourth Geneva Conventions, including but not limited to Article 3 Common to all Four Conventions.

102.    Violations of provisions of the Geneva Conventions are direct and enforceable treaty violations as well as violations of the law of nations.

103.    Defendants are liable for violations of Plaintiff's rights under the Geneva Conventions because each of the Defendants formulated, approved, authorized, directed, supervised, or carried out the prolonged arbitrary detention and other cruel, inhuman or degrading treatment of Plaintiff as part of a policy, pattern or practice.

104.    Defendants acted under color of official authority in subjecting Plaintiff to prolonged arbitrary detention and other cruel, inhuman or degrading treatment in violation of the Geneva Conventions.

105.    Defendants' actions were a proximate cause of the prolonged arbitrary detention and other cruel, inhuman or degrading treatment suffered by Plaintiff.  Plaintiff was a foreseeable victim of these acts.

106.    Defendants' actions subjecting Plaintiff to prolonged arbitrary detention and other cruel, inhuman or degrading treatment caused Plaintiff to suffer damages, including mental and emotional pain and suffering, in an amount to be determined at trial.

107.    Defendants' actions violating the Geneva Conventions were deliberate, willful, intentional, wanton, malicious, and oppressive.

## PRAYER FOR RELIEF

Plaintiff therefore respectfully requests that the Court enter a judgment including:

a.    As to all defendants, a declaration that Defendants' acts, policies, patterns, or practices alleged herein are unlawful and violate the U.S. Constitution, treaty provisions including provisions of the Geneva Conventions, and the law of nations;

b.    As to defendants Casey, Brandenburg, and Does 1-10, compensatory damages for violation of the Constitution, the law of nations, and the Geneva Conventions, in an amount to be determined at trial;

c.      Reasonable attorneys' fees and costs; and

d.      All other appropriate relief as may be just and proper.

Respectfully submitted,

/s/ *Mark D. Rosenbaum*

_____

Mark D. Rosenbaum
Ranjana Natarajan
Ahilan T. Arulanantham
ACLU Foundation of Southern California
1616 Beverly Boulevard
Los Angeles, California 90026
Tel: (213) 977-9500, x224
Fax: (213) 250-3919

/s/ *Dan Marmalefsky*

_____

Dan Marmalefsky
Angelica M. Morales
Morrison & Foerster LLP
555 West Fifth Street, Suite 3500
Los Angeles,  CA  90013-1024
Tel.   (213) 892-5809
Fax:   (213) 892-5454

/s/ *Paul Hoffman*

_____

Paul Hoffman
Schonbrun, DeSimone, Seplow, Harris &
    Hoffman
723 Ocean Front Walk
Venice, California 90291
Tel: (310) 396-0731
Fax: (310) 399-704

/s / *Arthur B. Spitzer*

_____

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the National Capital Area
1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
Tel. 202-457-0800
Fax 202-452-1868

May 29, 2007                                    Attorneys for Plaintiff

**I (a) PLAINTIFFS**

**DEFENDANTS**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

1 U.S. Government
Plaintiff

2 U.S. Government
Defendant

3 Federal Question
(U.S. Government Not a Party)

4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| **A.** *Antitrust* | **B.** *Personal Injury/ Malpractice* | **C.** *Administrative Agency Review* | **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| 410 Antitrust | 310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product Liability<br>360 Other Personal Injury<br>362 Medical Malpractice<br>365 Product Liability<br>368 Asbestos Product Liability | 151 Medicare Act<br><br>Social Security:<br>861 HIA ((1395ff)<br>862 Black Lung (923)<br>863 DIWC/DIWW (405(g)<br>864 SSID Title XVI<br>865 RSI (405(g)<br>Other Statutes<br>891 Agricultural Acts<br>892 Economic Stabilization Act<br>893 Environmental Matters<br>894 Energy Allocation Act<br>890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

## E. General Civil (Other)    OR    F. Pro Se General Civil

| **Real Property**<br>210 Land Condemnation<br>220 Foreclosure<br>230 Rent, Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property<br><br>**Personal Property**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | **Bankruptcy**<br>422 Appeal 28 USC 158<br>423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>535 Death Penalty<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br><br>**Property Rights**<br>820 Copyrights<br>830 Patent<br>840 Trademark<br><br>**Federal Tax Suits**<br>870 Taxes (US plaintiff or defendant<br>871 IRS-Third Party 26 USC  7609 | **Forfeiture/Penalty**<br>610 Agriculture<br>620 Other Food &Drug<br>625 Drug Related Seizure of Property 21 USC 881<br>630 Liquor Laws<br>640 RR & Truck<br>650 Airline Regs<br>660 Occupational Safety/Health<br>690 Other<br><br>**Other Statutes**<br>400 State Reapportionment<br>430 Banks & Banking<br>450 Commerce/ICC Rates/etc.<br>460 Deportation | 470 Racketeer Influenced & Corrupt Organizations<br>480 Consumer Credit<br>490 Cable/Satellite TV<br>810 Selective Service<br>850 Securities/Commodities/ Exchange<br>875 Customer Challenge 12 USC 3410<br>900 Appeal of fee determination under equal access to Justice<br>950 Constitutionality of State Statutes<br>890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| **G.** *Habeas Corpus/ 2255* | **H.** *Employment Discrimination* | **I.** *FOIA/PRIVACY ACT* | **J.** *Student Loan* |
|---|---|---|---|
| 530 Habeas Corpus-General<br>510 Motion/Vacate Sentence | 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | 895 Freedom of Information Act<br>890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| **K.** *Labor/ERISA (non-employment)* | **L.** *Other Civil Rights (non-employment)* | **M.** *Contract* | **N.** *Three-Judge Court* |
|---|---|---|---|
| 710 Fair Labor Standards Act<br>720 Labor/Mgmt. Relations<br>730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>740 Labor Railway Act<br>790 Other Labor Litigation<br>791 Empl. Ret. Inc. Security Act | 441 Voting (if not Voting Rights<br>Act)<br>443 Housing/Accommodations<br>444 Welfare<br>440 Other Civil Rights<br>445 American w/Disabilities-<br>Employment<br>446 Americans w/Disabilities-<br>Other | 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of Overpayment &<br>Enforcement of Judgment<br>153 Recovery of Overpayment of<br>Veteran's Benefits<br>160 Stockholder's Suits<br>190 Other Contracts<br>195 Contract Product Liability<br>196 Franchise | 441 Civil Rights-Voting<br>(if Voting Rights Act) |

---

**V. ORIGIN**

| 1 Original<br>Proceeding | 2 Removed<br>from State<br>Court | 3 Remanded from<br>Appellate Court | 4 Reinstated<br>or Reopened | 5 Transferred from<br>another district<br>(specify) | 6 Multi district<br>Litigation | 7 Appeal to<br>District Judge<br>from Mag. Judge |
|---|---|---|---|---|---|---|

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

---

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 | **DEMAND $**<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>**YES**     **NO** |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | **YES**     **NO** | If yes, please complete related case form. |
|---|---|---|---|

**DATE**                    **SIGNATURE OF ATTORNEY OF RECORD**

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
#### Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  Listed below are tips for completing the civil cover sheet.  These tips coincide with the Roman Numerals on the Cover Sheet.

   I.       COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C.,  and 99999 if plaintiff is outside the United States.

   III.      CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

   IV.      CASE ASSIGNMENT AND NATURE OF SUIT:   The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint.  You may select only <u>one</u> category.  You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

   VI.      CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

   VIII.     RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.