UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CYRUS KAR,                              :
                                        :
        Plaintiff,                      :
                                        :
    v.                                  :  Civil Action No. 07-0984 (JR)
                                        :
DONALD RUMSFELD, *et al.*,              :
                                        :
        Defendants.                     :

## MEMORANDUM

Cryus Kar, a U.S. citizen, was seized and detained by the U.S. military in Baghdad for nearly two months in 2005. He sues for violations of his Fourth and Fifth Amendment rights. The defendants -- the Secretary of Defense, two generals, and John Does -- move to dismiss. The motion will be granted.

## Background

Kar's allegations are taken as true for the purpose of this motion. He alleges that he went to Iraq in May 2005 to work on a historical documentary; that on May 17, he and his cameraman, an Iranian national, hired a taxi from the central taxi depot in Baghdad to take them to a site they were to film; that Iraqi police stopped the taxi at a routine vehicle checkpoint near the city of Balad; that, upon searching the vehicle, the police found washing machine timers in the trunk; and that, because such timers are a common component of improvised explosive devices ("IEDs"), the police arrested him, his cameraman, and the taxi driver.

Kar informed the Iraqi police of his U.S. citizenship and was transferred to U.S. military custody. The military took him to the Poliwada detention center, where he was questioned by a U.S. Army officer. Kar told the officer that the timers were not his, that he had not known they were in the taxi, and that he did not know the taxi driver. The officer told him later that day that the taxi driver had confirmed Kar's story.

Two days later, the military transported Kar from Poliwada to a detention center in Tikrit, to Abu Ghraib prison shortly thereafter, and ultimately to Camp Cropper, a military detention center near the Baghdad airport. During this initial transfer and detention period, he was held in an "outdoor cage" for hours at a time in the sweltering heat, he passed out from heat exhaustion while being transported to Tikrit, and a guard at Abu Ghraib slammed his head against a wall.

Kar spent the next seven weeks at Camp Cropper, in solitary confinement, in a small cell with no toilet or sink. He was permitted to leave the cell for one hour a day, spending the hour in an outdoor chain-link cage covered with a tarp.

Four days after his arrival at Camp Cropper, Kar was interrogated by an FBI agent. When he asked the agent if he could speak with an attorney, the agent laughed and replied that none were available. The agent added that Kar had the right to remain silent, but he said that the last person to exercise that

right was still being detained in Afghanistan two years later. Kar ultimately agreed to take a lie detector test and consented to a search of his home in Los Angeles.

On May 23, FBI agents searched Kar's home and seized his computer, personal files, and certain financial records. Approximately two weeks later, FBI agents returned Kar's belongings to his family, informed them that the FBI had found nothing incriminating during its investigation, and told them to expect Kar back in the United States shortly.  When Kar did not return after a week, his family contacted the American Civil Liberties Union.  ACLU attorneys asked several government agencies about Kar's status, and requested his immediate release. They also filed a habeas petition with this Court.

Back at Camp Cropper, Kar took a lie detector test on June 15.  He once again asked for, and was denied, an attorney, but he was told that he had passed the test.  On July 1, Kar received a letter written by the officer then serving as president of the Detainee Status Board.  The letter informed him that a hearing would be held on July 4 to determine his status under the Geneva Convention; that the military suspected him of possessing explosive materials at the time of his arrest; and that he was not entitled to legal counsel, but could have a "personal representative" at the hearing.

Kar's hearing took place as scheduled on July 4 before three military officers.  Kar once more requested an attorney.  He asked that the FBI agents and military officers who interrogated him and the cameraman who accompanied him in the taxi be summoned as witnesses.  He asked for the reports of his interrogation and the results of his lie detector test.  Most of these requests were denied: the cameraman was permitted to testify, and the lie detector test results were read aloud.

The military officers decided that Kar was innocent and recommended his immediate release.  Two days later, still in detention, Kar received another letter from the Detainee Status Board, confirming that he had been classified as an "Innocent Civilian" and was scheduled for immediate release.  On July 10 -- 54 days after his detention, six days after his status hearing, four days after the letter from the Detainee Status Board, and one day before the U.S. was required to respond to the habeas petition filed in this Court on Kar's behalf -- Kar was released.

What remains of Kar's suit after his voluntary dismissal of his claims for declaratory relief (see Dkt. 17), and the dismissal of his claims for violations of the law of Nations and the Geneva Conventions (for failure to exhaust administrative remedies; see Rasul v. Myers, 512 F.3d 644, 662-63 (D.C. Cir. 2008)), is a Bivens action for damages.  The named defendants, former Secretary of Defense Donald Rumsfeld, General George

Casey, General William Brandenburg, and various John Does who participated in his detention at Camp Cropper, are sued in their individual capacities for violating Kar's Fourth and Fifth Amendment rights.

## **Discussion**

The government asserts a series of fallback arguments for dismissal: first, that Kar is not entitled to the protections of the Fourth and Fifth Amendment because he was seized and detained in a foreign war zone; second, that <u>Bivens</u> does not provide a cause of action in this context, and, because of several "special factors counseling hesitation," should not be extended to do so, <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388, 396 (1971); third, that the defendants did not violate Kar's constitutional rights; and fourth, in any event, that the defendants are entitled to qualified immunity because any of Kar's Fourth and Fifth Amendment rights that may have been violated were not "clearly established." <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

The first argument is easily disposed of.  The Fourth and Fifth Amendments certainly protect U.S. citizens detained in the course of hostilities in Iraq:

> The United States is entirely a creature of the
> Constitution.  Its power and authority have no other
> source.  It can only act in accordance with all the
> limitations imposed by the constitution.  When the
> Government reaches out to punish a citizen who is
> abroad, the shield which the Bill of Rights and other

>    parts of the Constitution provide to protect his life
>    and liberty should not be stripped away just because he
>    happens to be in another land.

Reid v. Covert, 354 U.S. 1, 5-6 (1957) (plurality); see also United States v. Toscanino, 500 F.2d 267, 280 (2d Cir. 1974) ("That the Bill of Rights has extraterritorial application to the conduct of federal agents directed at United States citizens is well settled").

The government's third and fourth arguments, however, are more persuasive, and they are dispositive: Kar has alleged facts sufficient to make out a Fourth Amendment violation, but his rights were not clearly established "in light of the specific context of the case." Saucier, 533 U.S. at 201. As for the Fifth Amendment, it is not clear whether Kar has identified violations; if he has, however, they are not violations of a clearly established right.[1]

### A. Fourth Amendment

Kar contends that defendants violated his Fourth Amendment rights in two respects: first, by detaining him for nearly seven weeks without a probable cause hearing or a reasonable facsimile thereof; and second, by continuing to detain him after he had been cleared by an FBI investigation and deemed innocent by a military panel. See Dkt. 18, at 30. Kar's second

---

[1] Because defendants' third and fourth grounds for dismissal are dispositive, I need not decide whether Bivens provides, or should provide, a cause of action.

claim is more appropriately analyzed under the Fifth Amendment. See Goldberg v. Hennepin County, 417 F.3d 808, 810-11 (8th Cir. 2005) ("Claims alleging the excessive detention of one who has established the right to be released are typically analyzed under the Due Process Clause"). Accordingly, I will address it with Kar's other Fifth Amendment claims in the following section.

"The touchstone of the Fourth Amendment is reasonableness." United States v. Knights, 534 U.S. 112, 118 (2001). Kar concedes that his initial arrest and detention were reasonable, see Dkt. 18, at 31, but argues that his continued detention without a hearing was unreasonable because the Fourth Amendment requires a "prompt[]" hearing to assess the sufficiency of the evidence supporting detention. See Gerstein v. Pugh, 420 U.S. 103, 125 (1975). In the domestic criminal context, the Supreme Court requires that a detained individual receive a hearing within 48 hours of his seizure. See County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991). Congress insists that non-citizens detained pursuant to the USA Patriot Act receive a probable cause hearing within seven days. See 8 U.S.C. § 1226a(5). Kar claims that his detention for 48 days[2] without a hearing -- more than 20 times longer than acceptable for domestic

---

[2] Kar repeatedly asserts that he was held for 57 days without a hearing. See Dkt. 18, at 30, 32. But his pleadings establish that he was detained on May 17, 2005, and given a hearing on July 4, 2005 -- a span of 48 days.

criminal suspects, and nearly seven times longer than permitted for aliens suspected of endangering U.S. national security -- must be unreasonable.

The government urges, however, that Kar's extended detention without a hearing was reasonable when considered in its context.  The 48-hour requirement in County of Riverside arose from a "'practical compromise' between the rights of the individuals and the realities of law enforcement." County of Riverside, 500 U.S. at 53 (quoting Gerstein, 420 U.S. at 113). The Supreme Court acknowledged that "the Fourth Amendment permits a reasonable postponement of a probable cause determination while the police cope with the everyday problems of processing suspects through an overly burdened criminal justice system." County of Riverside, 500 U.S. at 55.  In the government's view, the "everyday problems of processing suspects" that arise for the military in Iraq are far more daunting than those encountered by the domestic police: "[t]he exigencies are more pressing, the stakes higher, and the pre-existing systems more rudimentary." Dkt. 13, at 25.  Under similar circumstances, the government notes, the Supreme Court permitted the military to detain a suspected insurgent for two and a half months without a probable cause hearing, see Moyer v. Peabody, 212 U.S. 78, 82-86 (1909), and it submits that the military should be permitted to do so in this instance as well.

It may indeed be inconvenient to hold prompt probable cause hearings in Iraq, and military officials will be justifiably wary of releasing a suspected insurgent -- particularly one thought to be involved in the manufacture of the IEDs that have claimed so many American lives.  But it is startling that the government thinks it fitting to rely on a century-old Oliver Wendell Holmes opinion that asserts, flatly and without nuance, that "public danger warrants the substitution of executive power for judicial power."[3]  Id. at 85.  Granted that the "exigencies are more pressing" in Iraq, and that "the stakes are higher" there, and that "pre-existing systems are more rudimentary" -- an army that is fully equipped with the latest technology can surely organize itself to convene a probable cause hearing in far less than 48 days.

Kar's problem in this suit, however, is that his right to a probable cause hearing was not clearly established with sufficient specificity to overcome the defendants' qualified immunity.  As weak as the government's authority is, Kar has provided none at all -- no precedent that clearly establishes the right of a U.S. citizen to a prompt probable cause hearing when detained in a war zone.  Any attempt to apply the two-day

---

[3] In Moyer, the Court did not even hold that the detention was lawful; it held only that it was not done in bad faith, and therefore dismissed the suit based on then-existing law that is analogous to modern qualified immunity law.  Cf. Hamdi v. Rumsfeld, 542 U.S. 507, 572 (Scalia, J., dissenting).

requirement from City of Riverside or the seven-day requirement from the Patriot Act to Kar's circumstances ignores the differences between detention on U.S soil and detention in hostile territory.  Because defendants did not violate any clearly established Fourth Amendment right, they are entitled to immunity.

**B. Fifth Amendment Claims**

Kar asserts that the "due process violation in this case derives from the totality of circumstances defining [his] indefinite, arbitrary and prolonged detention," focusing on three specific circumstances: (1) his detention without charge, and therefore, without notice of any charge; (2) his lack of opportunity to be heard in a meaningful manner at the Detainee Status Board hearing; and (3) his continued detention despite being found innocent.  See Dkt. 18, at 27-29.

(1) Kar was both charged and given notice of the charge.  The officer who interrogated him only hours after his arrest "explained about the washing machine timers," which was the factual basis for his arrest.  Compl. ¶ 28.  Kar then received formal notice of the cause of his detention on July 1, in the form of a letter from the Detainee Status Board stating that the military suspected that he possessed explosive materials.  Id. ¶ 48.  Thus, he did receive "notice of the factual basis for" his detention.  Hamdi, 542 U.S. at 533.

- 10 -

(2) At his Detainee Status Board hearing, Kar was not permitted to summon certain government personnel as witnesses, was refused access to his interrogators' reports, and was denied access to counsel.  He asserts that, taken together, these facts offended the Supreme Court's pronouncement in Hamdi that a detainee is entitled to "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker," and "unquestionably has the right to access to counsel."  Id. at 533, 539.

The Hamdi decision applied the Mathews balancing test, weighing the individual's interest against the government's interest.  See id. at 529.  If those interests are weighed here, they strike a different balance.

Kar was being held on the battlefield, where, as the Hamdi Court noted, the government has a strong interest in ensuring that the "military officers who are engaged in the serious work of waging battle . . . [are not] unnecessarily and dangerously distracted by litigation," and a strong interest in protecting reports that might divulge military tactics.  Id. at 531-32.  The government's inability or unwillingness to summon certain military personnel as witnesses and its refusal to turn over reports that might divulge interrogation techniques were acceptable given the interests at stake.

The Court's observation that Hamdi "unquestionably [had] the right to access to counsel" was made in the context of a habeas proceeding in Virginia.  <u>Id</u>. at 539.  The differences between such a proceeding and a Detainee Status Board in Baghdad are obvious.  No court has found a right to counsel in such a proceeding, in such a place, at such a time, and it certainly cannot be said that Kar had a "clearly established" right to counsel.

(3) I cannot find a constitutional violation in Kar's detention for six days following the Status Board's pronouncement of his innocence.  The government could not simply open the door and let Kar walk free into the middle of Baghdad.  Under the circumstances, the two days that it took to formalize the Status Board's decision, and the four days that it took to arrange for Kar's release, were not unreasonable given the government's interest in ensuring Kar's proper and safe release.

## CONCLUSION

Defendants are entitled to qualified immunity because they did not violate any of Kar's clearly established constitutional rights.  The defendants' motion to dismiss is granted by the order that accompanies this memorandum.


JAMES ROBERTSON
United States District Judge